**LINCOLN NAT. LIFE INS. CO. v. HORWICH et al.**

**BRUNSWICK v. HORWICH.**

No. 7309.

Circuit Court of Appeals, Seventh Circuit. Nov. 15, 1940.

A. R. Simon, of Hollywood, Cal., Morton Garbus, of Los Angeles, Cal., and Stephen A. Mitchell, of Chicago, Ill., for appellant.

Jacob Logan Fox, of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This case was instituted, as an interpleader action, by the Lincoln National Life Insurance Company, (herein referred to as the "insurance company") in which Bernard Horwich and Stella L. Brunswick, claimants to the proceeds of two life insurance policies issued by the insurance company upon the life of Ronald F. Brunswick, were named as defendants.

Bernard Horwich claimed the proceeds by virtue of assignments from the insured to secure an indebtedness owing to Horwich individually and as trustee. Stella L. Brunswick (wife of Ronald F. Brunswick) claimed as beneficiary and disputed the validity of the assignments to Horwich. On June 8, 1939, the date of the death of Ronald F. Brunswick, the policies had a net value of $30,302.84, which the insurance company paid into the register of the court and was released. The court decided that Bernard Horwich was entitled to such proceeds and rendered judgment accordingly. Stella L. Brunswick appeals from this judgment. (Hereinafter she will be referred to as "appellant" and Bernard Horwich as "appellee.")

The contested issues presented by the appellant are, (1) that the evidence does not support the findings of fact or judgment, (2) that it was error to admit oral evidence to explain, vary, or contradict the written instruments of assignment, and (3) that the judgment was improperly rendered in favor of appellee in his individual capacity.

The Public State Bank of which appellee was director and owner of 85 per cent of the capital stock, was organized in 1920 and located in Chicago, Illinois. His son-in-law, Bernard Jadwin was vice-president, cashier and a director of the bank. Ronald F. Brunswick, by reason of his acquaintance with Bernard Jadwin, established a line of credit with the bank which enabled him to borrow money. The bank ceased active operations on July 22, 1930. Its assets generally were taken over

894

by another bank, and its liabilities assumed. Among the assets which the other bank refused to take over, however, were the notes of Ronald F. Brunswick, in the amount of $16,000. Subsequent to its cessation of active business, the bank commenced the liquidation of its retained assets for the benefit of stockholders. By a written instrument dated July 22, 1930, they appointed appellee and Bernard Jadwin trustees, invested them with complete title to the assets with authority to collect all notes, and to maintain in their names, individually or as trustees, any proceedings necessary to enforce collection. The bank was thereafter dissolved, and the trustees have since been engaged in the liquidation of the bank's assets.

At the time the bank was discontinued as an operating institution, Ronald F. Brunswick, in addition to his indebtedness to the bank, owed appellee personally the sum of $1500 evidenced by promissory notes. At different times, Jadwin and appellee spoke to Brunswick, requesting that he discharge his indebtedness to the trustees and to appellee. In February, 1931, at a conference, Jadwin informed Brunswick that unless such indebtedness was discharged or adequately secured, the notes would be placed in judgment. Brunswick suggested that he had no security to offer other than some insurance policies on his life. Jadwin advised Brunswick that he would take the matter up with appellee and let Brunswick know whether this arrangement was satisfactory. Later, Brunswick was advised by Jadwin that appellee would agree to take the insurance policies and that he would desist from any legal proceeding. Brunswick advised Jadwin that he was leaving Chicago permanently for California and that he would make every effort to pay the indebtedness due to appellee and to the trustees of the bank. Brunswick moved to California in 1931 and remained there until his death in June, 1939. During 1931 and 1932, Jadwin wrote Brunswick on a number of occasions demanding that the policies be delivered in accordance with the agreement. About November 1, 1932, Brunswick sent by mail to Jadwin, two policies of insurance, one in the face amount of $10,000, and the other in the face amount of $25,000, both subject to policy loans theretofore made to Brunswick to the extent of the full cash value of said policies. (It is the proceeds of these policies which is in dispute.)

On November 28, 1932, Brunswick wrote Jadwin, enclosing notices from the insurance company, advising that semi-annual premiums were due upon the two policies, one of the premiums being in the sum of $365.69, and the other in the amount of $146.31. Brunswick also stated in his letter that he had sent to the insurance company what he described as "change of beneficiary blanks." After some correspondence with the insurance company as to the form of instruments of transfer, Brunswick and appellant, (his wife and beneficiary) under date of December 12, 1932, executed a written assignment as to each of said policies.[1] Such assignments were delivered to the insurance company. Shortly thereafter, Jadwin procured from the insurance company copies of the assignments and learned for the first time that they were made to him personally. He thereupon wrote a letter to Brunswick and reminded him that the real obligee was Horwich, and that Horwich was to pay the premiums on the policies. So far as the record discloses, no reply was received to this letter. At the time the assignments were made, or subsequently, there was no debt owing by Brunswick to Jadwin individually.

On February 4, 1933, Jadwin assigned and transferred to appellee all his right,

---

[1] The two assignments are identical except that one describes the $25,000 policy, and the other the $10,000 policy. They are entitled "Assignment of Policy as Collateral Security." They provide "for and in consideration of the sum of One Dollar * * * and as security for the indebtedness hereinafter mentioned, we hereby sell, assign, transfer, set over and convey unto Bernard Jadwin, executors, administrators, successors or assigns, as the interest of said assignee may appear, all right, title and interest in (policy described)." It is then recited that the assignment "is intended to secure such indebtedness of the insured to the assignee as may exist at the time of settlement under this policy and this assignment is expressly limited to such of the proceeds under the policy as may be necessary to liquidate said indebtedness, the remainder of the policy being unaffected hereby. Upon payment of the obligation hereby secured this assignment shall become null and void upon notice of such payment in writing to the Lincoln National Life Insurance Company."

title and interest in said policies of insurance. On February 8, 1933, the insurance company advised Brunswick of the reassignments to appellee. In December, 1932, when the policies were assigned to Jadwin, they had no cash surrender value, being encumbered by loans theretofore made to Brunswick, to the extent of their full cash value. It was stipulated on the trial that the payment by appellee of the premiums due on the two policies December 8, 1932, prevented their lapse at a time when they were of no value. From the time the two policies were assigned to appellee until the death of Brunswick, appellee paid all premiums in the amount of $6,788.60, and interest on the policy loans to Brunswick in the amount of $1,822.93. These premiums paid by appellee, the interest paid to the insurance company on Brunswick's loans with 5 per cent interest thereon from the time made until the time of the trial, plus the principal indebtedness due from Brunswick to appellee individually, and as trustee of The Public State Bank, with interest on such indebtedness to the time of the trial, amounted to $38,258.05. This was $8,000 more than the sum deposited in the registry of the court by the insurance company as the net proceeds of the two policies.

On June 24, 1939, appellant filed with the insurance company a sworn statement of the details of her claim to the proceeds of the policies. In response to the question, "Have any policies in this company ever been assigned"? she replied, "Yes. Bernard Horwich."

Appellant's contention, on which she relies largely for reversal, is predicated upon the argument that the court improperly received oral testimony as to the agreement between Jadwin and Brunswick, prior to the departure of the latter for California, by which he agreed to assign insurance policies as collateral for his debt owing the trustees and appellee individually. A number of the court's findings, it is true, are predicated upon this oral agreement. As we view the matter, it would serve no useful purpose to discuss these findings in detail. The court, after finding facts substantially as related, in reference to the assignment of December 12, 1932, found: "It was clearly intended by said Ronald F. Brunswick and Stella L. Brunswick by their assignments, to carry out the terms of the oral agreement entered into by Ronald F. Bruns-

wick with Bernard Jadwin, as trustee for The Public State Bank, and for Bernard Horwich, in February of 1931, * * * and these assignments were intended by the parties to secure the indebtedness due from Ronald F. Brunswick to The Public State Bank and its trustees and to Bernard Horwich personally. The assignment * * * was intended by Ronald F. Brunswick and Stella L. Brunswick, to invest Bernard Jadwin with title as trustee and not individually."

It is the contention of appellant, as we understand, that oral testimony concerning any agreement between the parties prior to the execution of the written assignments was improperly received. Having thus eliminated any agreement or understanding which the parties had prior to the execution of the written assignments, it is appellant's position that the literal language of these assignments must control. Upon this basis it is claimed that the assignments were for the purpose of securing an indebtedness to Jadwin individually, and that when Jadwin reassigned to appellee, the latter acquired no greater interest than that had by Jadwin. In other words, by the language of the assignments, the policies became collateral only for debt owing, or which might be subsequently incurred, to Jadwin, and that when the policies were reassigned to appellee they continued as collateral, not for any debt due appellee individually or as trustee, but as collateral for a debt in favor of Jadwin individually. Therefore, the argument continues that inasmuch as no debt was owing to Jadwin at the time of Brunswick's death, there is nothing to be paid by reason of the assignments, and that appellant, as beneficiary, is entitled to the proceeds of the policies. This argument is so patently contrary to the clear intention of the parties that it must be rejected.

In the first place, we think the oral testimony was properly admitted. We need not analyze the authorities upon which appellant relies to the effect that a written instrument, clear and unambiguous on its face, can not be contradicted by parol evidence. This is a recognized rule. There is another rule, however, just as firmly established, and that is that parol or extrinsic evidence is admissible to explain the purpose of the execution of a written instrument, what the parties intended, the consideration for its execution and the

circumstances surrounding its execution. As was said in Jones v. New York Guaranty & Indemnity Co., 101 U.S. 622, 631, 25 L.Ed. 1030: "It is common learning in the law that parol evidence is admissible to show that a deed absolute on its face is a mortgage, to establish a resulting trust, to show that a written contract was without consideration, that it was void for fraud, illegality, or the disability of a party, that it was modified as to the time, place, or manner of performance or otherwise, or that it was mutually agreed to be abandoned; also to show the situation of the parties and the surrounding circumstances when it was entered into and to apply it to its subject, to show that a joint obligor or maker of a note was a surety, and that the acceptor or indorser of a bill or the maker or indorser of a note became such for the accommodation of the plaintiff. * * *"

The court, in the same case and on the same page, states another rule which seems material in the instant case: "* * * Where a party has entered into a written contract, it may be so shown that he did it as the agent of another, though the agency was concealed and the principal not disclosed, and the principal, in such case, may be held liable upon it. * * *"

This latter rule was recognized by this court in Queen Ins. Co. of America v. Citro, 7 Cir., 58 F.2d 107, 110: "A contract made by an agent in his own name may be shown by parol evidence to be that of the principal, where the transaction relates to the affairs of the principal and not to the personal affairs of the agent *. * *."

Thus, it would seem that oral testimony as to the circumstances which led up to and finally culminated in the written assignments was admissible for the purpose of showing what was meant and intended by the parties, as well as the capacities in which they acted. More than that, while somewhat at variance with the theory upon which the case was tried and decided by the District Court, we are of the opinion that the facts and circumstances, even excluding the oral testimony, disclose a definite intention on the part of Brunswick, his wife, and Jadwin that the assignments were for the purpose of furnishing collateral security for the indebtedness due the trustees of the bank, as well as appellee individually. A brief review of such facts and circumstances is convincing. Brunswick owed nothing to Jadwin, but he owed the trustees and appellee. Over a period of years he had dealt with Jadwin, not in his individual capacity, but as agent or trustee for the bank and appellee. He was aware that the affairs of the bank were being liquidated and that his loans were past due. After he went to California, he was urged by Jadwin, in written communications, to assign the policies as security for such indebtedness as he had promised to do before leaving Chicago. With this situation before him, it is inconceivable, in response to such urging on the part of Jadwin, that his intention was other than to assign the policies as collateral for such indebtedness. It approaches the absurdity to contend that it was his intention to assign the policies as protection to Jadwin individually, who had no reason either to demand or accept protection in such capacity.

The argument that Brunswick might have contemplated borrowing from Jadwin in the future, and that the assignment was to protect him in that contingency, is a possibility so remote as to call for no serious consideration. That Brunswick had no such thought in mind appears from his letter to Jadwin under date of January 5, 1939, in which he suggested: "If you could loan me $1000 for a year I could repay by forcing the trust company to pay me what is due me." The trust company referred to was a bank in California. It is apparent that if it had occurred to Brunswick that the policies had been assigned to Jadwin as security for a future loan, he would have attempted to utilize the security at that time.

In addition to the circumstances related, the conduct of Brunswick subsequent to the assignments is wholly inconsistent with appellant's theory. Brunswick, at the time the policies were assigned, must have had knowledge of the fact that he had borrowed upon them the full amount of their cash value; he was advised by Jadwin that the assignments should not have been to him individually, and that Jadwin had reassigned the policies to appellee. He also had knowledge that appellee, each year subsequent to the assignments, was paying the premiums upon the policies in the amount of $512 annually, and was paying the interest upon Brunswick's indebtedness to the insurance company. Under

these circumstances, it is inconceivable that any of the parties could have had the slightest idea that the assignments were for any purpose other than to secure Brunswick's indebtedness to the trustees and to appellee. While the record does not disclose just what knowledge appellant had of the circumstances related, it does appear that she was a party to the assignments, and after Brunswick's death, informed the insurance company that the policies had been assigned to appellee.

By reason of the facts related, and Brunswick's knowledge as to the position occupied by Jadwin, it must be held that when he executed the assignments to Jadwin, he was dealing with him as agent or trustee and not in his individual capacity. Jadwin, it must be remembered, was one of the trustees to liquidate the assets of the bank and had authority to act either in his own name or as trustee, and he also was agent for appellee, all of which was known to Brunswick. It follows that the policies were assigned as collateral security for his indebtedness to the trustees and to appellee. The reassignment of the insurance policies by Jadwin to appellee was clearly intended as is shown by the facts surrounding the transaction, as well as the subsequent conduct of the parties, as collateral for the same indebtedness.

Appellant also questions the right of appellee to recover the amount due him individually, and the amount due the trustees in a claim prosecuted in his individual capacity. Appellant appears to be concerned with the manner in which appellee will distribute the $16,000 owing to the trustees of the closed bank. It would appear that this question can be of little, if any, concern to appellant. Rule 17 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, however, authorizes the trustee of an express trust to sue in his own name without joining with him the party for whose benefit the action is brought. In addition, it appears that the assets held by the liquidating trustees belong to the stockholders, and that they alone are the beneficiaries of any recovery made from such assets. The stockholders designated trustees, one of whom was appellee, for the purpose of liquidating the bank's assets, "with full authority to sue, either in the name of this corporation, or in their own name, as trustee or otherwise, upon all notes." We think the

action may properly be maintained in the name of the appellee individually. The manner in which the proceeds realized from the judgment are to be distributed is not before us.

The judgment of the District Court is affirmed.